IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JONATHAN C. DAILEY,

   *Plaintiff,*

v.

  Case No.: 1:05-CV-02012
  Judge Ricardo M. Urbina

SUNGAH PARK, et al.,

   *Defendants.*

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE CLOSING OF PROPERTY UNDER SETTLEMENT AGREEMENT, OR IN THE ALTERNATIVE, TO DECLARE SETTLEMENT AGREEMENT VOID AND PROCEED WITH LITIGATION

COMES NOW THE DEFENDANTS, Sungah Park and Ayal Factor, by counsel, and hereby file their Opposition to Plaintiff's Motion to Enforce Closing Under Settlement Agreement Or, In the Alternative, to Declare Settlement Agreement Void and Proceed with Litigation ("Motion"). In support of their Opposition, and in support of Defendants' request that the Court determine that Plaintiff has breached the Settlement Agreement, the Defendants state as follows:

### I. FACTUAL BACKGROUND

This litigation began as a result of the failure by Jonathan C. Dailey, Plaintiff in this action and an attorney licensed to practice before this Court ("Mr. Dailey"), to honor the terms of a written agreement that he signed. The agreement was a Repurchase Option Contract ("Contract") involving a residential condominium unit located at 1080 Wisconsin Avenue, N.W., Unit 2006, Washington, D.C. (the "Property"). The terms of the Contract provided that Mr. Dailey would sell the Property to Ms. Park, that he would pay the carrying costs for the Property

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

to Ms. Park while he lived there, and that he could later repurchase the Property from Ms. Park --

provided that certain conditions were met. Mr. Dailey's right to repurchase would be lost,

however, if the rent was past due for thirty days and Mr. Dailey did not take all steps to

repurchase the Property from Ms. Park "within thirty days thereafter." Ms. Park initially

tolerated Mr. Dailey's failure to pay rent, which was chronic, but when Mr. Dailey failed to pay

the rent for several months in the summer of 2005, Ms. Park notified Mr. Dailey, by counsel, that

his right to repurchase was lost. Mr. Dailey reacted to that notice by threatening to file, and

actually filing, a multi-count complaint against Ms. Park and her husband, Mr. Ayal Factor. Mr.

Dailey repeatedly promised that he would pursue aggressive discovery and make this case an

expensive one for the Defendants.

Unfortunately, Mr. Dailey's pattern of failing to honor agreements continued during this

litigation. Mr. Dailey agreed to make Consent Protective Order payments, then failed to make

them. Even after he was warned by the Court about his obligation to make Protective Order

payments, Mr. Dailey made yet another late payment. To make matters worse, Mr. Dailey then

failed to follow the Court's Standing Order when filing a motion, which resulted in the issuance

of a show cause order. Mr. Dailey also concealed from the Court information about his

subtenant – information that was critical to the Court's decision on whether to set an increased

protective order amount. As the Court will now learn, Mr. Dailey has failed, yet again, to honor

a written agreement – the Settlement Agreement and Mutual Release that he signed on March 15,

2006, the terms of which were agreed to at a mediation before the Honorable Judge Kay.

A.    The Origin of the Settlement Agreement, the Mediation, and the Key Provisions of the
      Final Settlement Agreement.

As the Court may recall, at the Scheduling Conference on February 23, 2006,

Defendants' counsel advised the Court that the parties were "this close" (using hand gestures) to

2

settling this case. What separated the parties then was the amount that Mr. Dailey would pay the Defendants to buy the Property back, how quickly Mr. Dailey could go to closing, and the penalties for his failure to go to closing on a date certain.[1] A copy of Defendants' written settlement proposal of February 15, 2006 is attached as Exhibit A. Defendants' counsel requested mediation before a Magistrate Judge to hopefully bridge those three settlement gaps. The Court granted that request and a mediation was set before the Honorable Judge Kay. The mediation took place on March 13, 2006, in Judge Kay's chambers, and lasted for approximately four hours. During the mediation, the Defendants offered Mr. Dailey a variety of scenarios under which he could repurchase the Property from Ms. Park depending upon the timing of the closing date. If Mr. Dailey closed sooner, the purchase price would be less. If Mr. Dailey closed later, the purchase price would be more. After a series of back-and-forth offers and counter-offers, the parties ultimately agreed to a purchase price of $347,000.[2]

The $347,000 purchase price represented a significant reduction (by the Defendants) in the purchase price that they had previously demanded ($13,000). The Defendants only agreed to the reduced amount because: (a) Mr. Dailey agreed that he would be responsible for paying all closing costs; (b) Mr. Dailey agreed that he would be responsible for obtaining and preparing all closing documents and arranging for the closing to occur; (c) Mr. Dailey agreed to do all things necessary to achieve closing by April 27, 2006; and (d) there would be no extensions of the closing date -- no matter what the reason. Accordingly, it was made abundantly clear to Mr.

---

[1]    Defendants are providing the Court with a brief history of the settlement negotiations so that the Court has an understanding of how important it was for Mr. Dailey to comply with the Settlement Agreement, particularly the terms that provided that Mr. Dailey was responsible for the closing and that he had to go to closing no later than 6:00 p.m. on April 27, 2006.

[2]    Although the Defendants do not wish to entangle Judge Kay in this dispute, the Defendants do no object to this Court contacting Judge Kay to confirm, if necessary, what the Defendants' have represented did occur at the mediation.

Dailey, both verbally at the settlement table and in the two written settlement agreements, that he

had to do everything that was necessary to ensure that the closing would occur -- and be

completed -- by 6:00 p.m. on Thursday April 27, 2006.  A copy of the written settlement

agreement signed at the mediation is attached as Exhibit B ("Mediation Agreement").

Mr. Dailey and Defendants counsel met at Defendants' counsel's office on March 14 and

15, 2006 to prepare the written settlement agreement and release contemplated by the Mediation

Agreement.  After reviewing a series of drafts, Defendants' counsel and Mr. Dailey jointly

approved the "Settlement Agreement and Mutual Release," which was signed by the parties in

counterparts ("Settlement Agreement").  A copy of the executed Settlement Agreement is

attached as Exhibit C.  During the March 14-15, 2006 discussions, the parties negotiated

additional provisions, consistent with the Mediation Agreement, to again make it unmistakably

clear that Mr. Dailey had to go to closing by April 27, 2006, and that is was his sole

responsibility to prepare for closing.  The two relevant provisions of the Settlement Agreement

that clearly and unambiguously set forth Mr. Dailey's closing obligations are Sections 1 and 2 of

the Settlement Agreement, which state:

> 1.    Purchase of Property by Mr. Dailey.  Mr. Dailey agrees to
> purchase the Property from Ms. Park for the purchase price of
> Three Hundred Forty-Seven Thousand Dollars ($347,000.00) (the
> "Purchase Price"), which Purchase Price shall be paid in cash or
> immediately available funds to Ms. Park on the Closing Date (as
> hereinafter defined).  **Mr. Dailey must complete his purchase of
> the Property from Ms. Park (the "Closing") such that Closing
> will occur, and the Purchase Price will be disbursed to Ms.
> Park, on or before Thursday, April 27, 2006 at 6:00 p.m. (the
> "Outside Closing Date").**  Mr. Dailey will be responsible for the
> payment of all costs of any nature relating to the conveyance of the
> Property by Ms. Park to Mr. Dailey, including all transfer and
> recordation taxes, recording fees and all other closing and
> transactional costs associated with his purchase of the Property.
> **Mr. Dailey will take any and all steps necessary in order to
> assure that  Mr. Dailey's purchase of the Property from Ms.**

4

**Park and disbursement of the Purchase Price to Ms. Park occurs on or before the Outside Closing Date.** The actual date upon which settlement on the conveyance of the Property occurs is referred to herein as the "Closing Date." The Defendants make no representations or warranties of any nature regarding the Property, and the property will be conveyed by Ms. Park to Mr. Dailey in its AS-IS, WHERE-IS condition, WITH ALL FAULTS, without representation or warranty or any nature. The right to acquire the Property is personal to Mr. Dailey and he may not assign his right to acquire the Property or the deed to the Property to any person or entity.

2.    Outside Closing Date Final/Inability to Close. If Mr. Dailey is unable or unwilling, **for any reason**, to complete his purchase of the Property from Ms. Park on or before the Outside Closing Date, then: (a) Mr. Dailey will forever forfeit any right that he had to purchase the Property from Ms. Park under the Contract, under this Agreement, or otherwise (that is, the right of Mr. Dailey to repurchase the Property will automatically terminate without any further action by any Party), and his claims in the Litigation will be dismissed with prejudice; and (b) Defendants will be entitled to the immediate entry of a non-redeemable judgment for possession against Mr. Dailey, which they may execute immediately without any right of appeal or redemption.

Exhibit C at 2, Sections 1-2 (bold emphasis added).

In order to further ensure that Mr. Dailey had "gotten his closing act together" sufficiently in advance of the April 27, 2006 closing date, and knowing that it might take time to review and send the closing documents to be signed by Ms. Park (who lives in Florida), Defendants' counsel requested that Mr. Dailey agree to the insertion of the following additional provision into the Settlement Agreement:

16.    Further Assurances. Promptly upon written request, the Parties agree to **execute and deliver** to each other such additional documents as may be necessary or appropriate to consummate the transactions contemplated herein or to otherwise implement the terms of this Agreement; **however, Mr. Dailey agrees that he will deliver to Defendants, pursuant to the Notice provision, the Sales Agreement and any other documents that Defendants are required to sign for the closing at least seven business days prior to the Closing Date.** The Sales Agreement will be in a form substantially similar to the form sales agreement entered into

5

> between Ms. Park and Mr. Dailey and pursuant to which Mr.
> Dailey purchased the Property in August of 2003. The Defendants
> will not sign any form that does not accurately disclose the rental
> history for the Property, nor will Ms. Park be required to make any
> representations or warranties regarding the Property, nor execute
> any affidavits or indemnifications for the benefit of any party or
> person in connection with the conveyance of the Property to Mr.
> Dailey.

See Exhibit C at 2, Section 16 (bold emphasis added).

In addition, because Defendants' counsel knew that Mr. Dailey had a poor track record when it came to complying with written agreements (and court orders), Defendants' counsel also requested that Mr. Dailey be subject to a "strict compliance" standard under the Settlement Agreement, which is the highest standard that exists for contract compliance, especially when time is of the essence. See Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1012-13 (D.C. Cir. 1985) (when time is of the essence in a contract, acts taken after a deadline may not be considered as constituting performance by one party). Mr. Dailey agreed to be subject to "strict compliance" standard with respect to all of his obligations under the Settlement Agreement. Exhibit C at page 4, Section 12 ("If Mr. Dailey strictly complies with all of his obligations under this Agreement . . . ."). Mr. Dailey also agreed that he alone would "take any and all steps necessary in order to assure [sic – ensure] that Mr. Dailey's purchase of the Property from Ms. Park and disbursement of the Purchase Price to Ms. Park occurs on or before the Outside Closing Date." Exhibit C at 2, Section 1. What was most important to the Defendants -- a point made clear in the Settlement Agreement -- was that Mr. Dailey had to close by April 27, 2006 and that there would be no extensions of that date for any reason.[3]

---

[3]    It is important to note that the initial settlement agreement proposed by Defendants included language that would have allowed an extension of the closing date due to "a force majeure (disaster, terrorist incident, act of god)." That language was struck by the parties, which made it clear to Mr. Dailey that: (a) the April 27, 2006 closing date could not be extended under any circumstances; (b) that no excuses would be permissible if Mr. Dailey did not close on time; and (c) that Mr. Dailey took the sole risk that closing might be delayed "for any reason."

6

B.    <u>Mr. Dailey's Claims That Defendants Breached The Settlement Agreement Are Without</u>
      <u>Merit.</u>

In his Motion, Mr. Dailey makes one argument – an argument that is contrary to the

express terms of the Settlement Agreement.  Mr. Dailey claims that Defendants breached the

Settlement Agreement by refusing to obtain the payoff information from World Savings, which

Mr. Dailey claims was "in the exclusive province of the Defendants."  Motion at 9.  A review of

the express terms of the Settlement Agreement shows that Mr. Dailey is wrong.

The Settlement Agreement provides that Mr. Dailey alone "will take any and all steps

necessary in order to assure that  Mr. Dailey's purchase of the Property from Ms. Park and

disbursement of the Purchase Price to Ms. Park occurs on or before the Outside Closing Date."

Exhibit C at 2, Section 1.   The Defendants did not have to obtain any documents for Mr. Dailey.

Contrary to what Mr. Dailey argues, the language in Section 16 of the Settlement Agreement (the

"Further Assurances" provision) does not obligate the Defendants to obtain documents.  It

merely provides that the Defendants must "execute and deliver" additional documents.  It does

not state that "Defendants must obtain documents for Mr. Dailey."  It also does not state that

"Defendants must obtain payoff figures for Mr. Dailey."  Under the Settlement Agreement, Mr.

Dailey had the sole obligation to obtain all documents needed for closing and to present those

documents to Defendants at least seven days in advance of the closing.  It is that simple.  The

payoff information from World Savings was not a document that Defendants had to "execute and

deliver" under the Settlement Agreement.

What really happened is that, consistent with his past practice of procrastination, and in

violation of the seven day advanced notice requirement in the Settlement Agreement, Mr. Dailey

made no effort to contact World Savings in order to determine what he had to do in order to

obtain the payoff information from World Savings sufficiently in advance of the closing date.

Had Mr. Dailey taken this simple step, Mr. Dailey would have learned that the time for processing payoff requests from third parties is at least ten days. Mr. Dailey attempts, through barristerial alchemy, to shift blame for his failure to timely obtain the payoff figures from World Savings on to the Defendants. Mr. Dailey claims that he first requested that Defendants obtain the World Savings payoff figures via Ms. Tabitha Fitzgerald's voicemail to Defendant's counsel on April 14, 2006. April 14, 2006 was Good Friday. Although Defendants' counsel was not in the office on April 14, 2006, he nevertheless was not about to disclose to Ms. Fitzgerald (or to anyone else) Ms. Park's confidential, social security number.[4]

With respect to Ms. Fitzgerald's Declaration, her allegations are of no particular importance, except the fact that they provide clear evidence of Mr. Dailey's breaches. Moreover, there are a variety of reasons why Ms. Fitzgerald's allegations, even if they are accepted as evidence, are not credible. First, Ms. Fitzgerald expects to receive a commission on this transaction, so she is not a disinterested witness. Second, Ms. Fitzgerald repeatedly provided misinformation and incomplete documents to both Defendants' counsel and to Mr. Dailey. For example, Ms. Fitzgerald provided a Sales Contract addendum that listed herself as co-purchaser. See Exhibit D. Ms. Fitzgerald also falsely stated (during a joint telephone conference with Mr. Dailey and Defendants' counsel) that the only documents Ms. Park needed to be signed at closing were a Deed and a HUD-1 Settlement Statement. Ms. Fitzgerald later apologized when she discovered that a number of additional documents (Addendum to HUD-1, DC Form FP-7, and Seller's/Borrower's Affidavit) had to be signed by Ms. Park at closing. See Exhibit E. Ms. Fitzgerald also continued to falsely insist, as did Mr. Dailey, that Ms. Fitzgerald must have Ms. Park's social security number in order to obtain the World Savings payoff figures. Third,

---

[4]   Defendants' counsel also did not have that information to disclose.

Despite having "ten years of mortgage experience," Ms. Fitzgerald apparently failed, since

March 14, 2006, the time that Mr. Dailey claims that he first spoke with her (Fitzgerald

Declaration at 1, ¶ 3), to take the simple step of calling World Savings to determine how long it

would take for her to obtain a payoff statement from World Savings and what information would

be needed to make that request. Had she or Mr. Dailey taken the simple step of calling the

World Savings Customer Service number (1-800-642-0257), she or Mr. Dailey would have heard

the following:,[5]

> To obtain a new loan, payoff, or automated balance and payoff
> information, press 1. (1 pressed).
>
> For information regarding payoffs . . . press "3" (3 pressed).
>
> For payoff procedures, press 1 (1 pressed):
>
> World only provides payoff amounts in writing. Verbal payoff
> figures will not be quoted. **Payoff requests require ten business
> days to process**. Requests for adjustable rate loans with an
> interest rate change pending may be delayed until the new rate
> takes effect. Please note that we are unable to provide third parties
> with the status of pending requests. To receive a written payoff
> statement, please fax your request to area code 210-509-1122 or
> mail to World Savings, Attn: Payoff Dept. 4101 Wiseman
> Boulevard, Building 106, San Antonio, Texas 78251-4201. Please
> indicate the loan number, customer's name, property address,
> anticipated payoff date, and whether you would like the
> information returned by mail or by fax. Payoff statements returned
> by fax are assessed a $10 fax fee per request. For wiring
> instructions, press 1. To repeat this information, press 7.

Mr. Dailey concedes in his Motion that neither he nor his mortgage took any steps to contact

World Savings sufficiently in advance of the closing date. Mr. Dailey further concedes that he

---

[5]    Mr. Dailey knew World Savings' contact information because he had previously seen copies of prior mortgage
statements of Defendant Park. In any event, the World Savings Customer Service number was readily available.

waited one month to request loan information from the Defendants by not asking for that information until Friday, April 14, 2006, at the earliest.[6]

On Monday, April 17, 2006, the first business day after April 14, 2006 (Good Friday), Defendants' counsel sent a long letter to Mr. Dailey advising him of the flurry of errors that had been made in the draft Regional Sales Contract. See Exhibit G. Prior to sending that letter, Defendants' counsel had received yet another threatening e-mail from Mr. Dailey. See Exhibit H.[7] Defendants' counsel spoke to Mr. Dailey and advised him (again) that under the Settlement Agreement the Defendants' were not obligated to perform Mr. Dailey's closing obligations for him.

Also on Monday, April 17, 2006,[8] and after first investigating Ms. Fitzgerald's false claims concerning the need for Ms. Park's social security number, the Defendants promptly responded to the request for loan information for World Savings.  See Exhibit I.  In her affidavit, Ms. Fitzgerald not only tries to blame Defendants' counsel for her failures, but she also tries to shift blame to a title company representative named "Cassie."  In Section 11 of her Affidavit, Ms. Fitzgerald states that on April 20, 2006, she called "Cassie," and that "Cassie" told her that she was still waiting for a response to an e-mail request for the payoff figures from Defendants'

---

[6]    April 14, 2006 was Good Friday.  Defendants counsel was home sick that day – and would have left early that day for Catholic church services anyway -- and so advised Mr. Dailey.  See Exhibit F.

[7]    It should be noted that throughout the course of this litigation, Mr. Dailey has engaged in unprofessional conduct and otherwise not complied with his duty to act as an officer of this Court.  Mr. Dailey did not timely file an Answer to the Defendants' Counterclaim.  Mr. Dailey did not comply with the Consent Protective Order.  Mr. Dailey did not comply with the Court's Standing Order.  Mr. Dailey sent an e-mail to Defendants' counsel threatening to sue him and his law firm for "tortuous interference" if Defendants' counsel spoke with a key witness. And then, when his procrastination led to his inability to close, Mr. Dailey called the Court's law clerk, Mr. Dan Rosenthal, and left ex parte messages on Mr. Rosenthal's voicemail.

[8]    Defendants counsel was ill the entire Easter weekend and on Monday, April 17, 2006.  Nevertheless, Defendants' counsel came into the office on Monday, April 17, 2006 to respond to this matter.

counsel.[9]  This makes absolutely no sense, and further demonstrates the "comedy of errors" that occurred on Mr. Dailey's side of the closing table.  First, Ms. Fitzgerald cannot claim that she needed anything from "Cassie" on April 20, 2006 because she was sent all the information that she needed to obtain payoff information from World Savings on April 17, 2006.  Exhibit I. Second, Craig Sandler (who presumably works with "Cassie" of Sandler Title) wrote to Defendants' counsel on April 18, 2006 and stated that "We were forwarded the information to order the payoffs, thank you."  See Exhibit J.

Notwithstanding the fact that Ms. Park's social security number was not required in order to order payoff information from World Savings, Mr. Dailey and Ms. Fitzgerald continued to waste precious time by asserting that they needed that information.  To put that issue to rest, and even though he was under no obligation to do so, Defendants' counsel called World Savings to find out what information was actually needed to obtain the payoff figures.  Defendants' counsel then wrote Mr. Dailey a detailed letter to that effect on April 21, 2006.  See Exhibit K.

On Friday, April 21, 2006, at 2:49 p.m., Mr. Dailey demanded, by e-mail, that Ms. Park sign a "Borrower's Certification and Release" to be sent to World Savings.  Exhibit L.  This was the first time -- less than six days prior to closing -- that Mr. Dailey had requested that Ms. Park sign any document to be sent to World Savings.  Even though Ms. Park had already provided to Mr. Dailey all the information that he needed to obtain the payoff figures from World Savings, and even though the Borrower's Certification was not sent to Ms. Park at least seven days prior to closing, Ms. Park nevertheless signed the Borrower's Certification and sent it to Mr. Dailey by e-mail in just over one hour's time (at 4:06 p.m.).   See Exhibit M.  Because neither Mr. Dailey nor his mortgage broker had submitted a payoff request to World Savings, in writing, until late in

---

[9]     Ms. Fitzgerald's Affidavit, which itself is hearsay, is cluttered with inadmissible statements (hearsay on multiple levels).  Her alleged conversation with "Cassie" is just one example.

the afternoon of April 21, 2006 (six days prior to closing), the request was apparently not

processed by World Savings until Monday, April 24, 2006.

C.      Mr. Dailey's Frantic Efforts to Close.

        The week of April 24, 2006 was no different as far as Mr. Dailey and his mortgage

broker were concerned.  Each of them continued to make mistakes and to break promises to

provide closing documents for Ms. Park to sign.  On April 24, 2006, less than four days prior to

closing, neither Mr. Dailey nor his mortgage broker had sent Defendants' counsel all of the

documents that Ms. Park needed to sign at closing.  Defendants' counsel again reminded Mr.

Dailey of this problem after Mr. Dailey's promise to provide a revised HUD-1 by Monday

morning went unfulfilled.  See Exhibit N.

        On Monday, April 24, 2006, Mr. Dailey e-mailed Defendants' counsel, and in another

effort to cover up his closing failures, he stated:  "I have spoken with the attorney for the title

company.  There are two standard DC-mandated forms that Ms. Park must sign that are in no

way relevant to the terms of our agreement."  See Exhibit O.  Mr. Dailey further opined in his e-

mail that "[a]lthough the critical documents were provided in that timeframe [seven days], I have

no doubt Judge Urbina will agree that the incidental DC mandatory forms were not contemplated

by our agreement."[10]  Exhibit O.  Mr. Dailey promised to fax these "unrelated," "non-critical"

documents to Defendants' counsel for review.

        On Tuesday, April 25, 2006, Mr. Dailey called Defendants' counsel in a panic.  He

insisted that Ms. Park must call World Savings herself and demand the payoff figures on an

expedited basis.  In yet another good faith effort to assist Mr. Dailey with his closing

---

[10]     This statement of course makes no sense.  If the documents that Mr. Dailey was going to send to Ms. Park were "in no way relevant to the terms of our [settlement] agreement" or to the closing, then why did Ms. Park even need to see them or sign them?

deficiencies, and even though they were under no obligation to do so, Ms. Park and Defendants' counsel called World Savings on the phone together and requested that World Savings expedite providing the payoff information to Ms. Fitzgerald. Defendants' counsel then immediately notified Mr. Dailey as to what they had just done. See Exhibit P.

On Tuesday, April 25, 2006 (two days prior to closing), Defendants' counsel finally received from Ms. Fitzgerald the final deed that Ms. Park was supposed to sign at closing. See Exhibit Q. Even though these documents were not sent seven days in advance (by FedEx) as required by the Settlement Agreement, Ms. Park completed them and sent a signed version to Mr. Dailey by e-mail the very next day. See Exhibit R. Defendants' counsel again noted that it was April 26, 2006 (one day prior to closing), and he still had not received all of the documents that Ms. Park needed to sign at closing.

D.    Mr. Dailey Tries To Get The Court To Solve His Closing Failures.

On April 27, 2006, Mr. Dailey contacted the Court, again in an effort to cover his tracks and to try to solve the problem that he had created by not properly preparing for closing. The Court, the Court's law clerk, Defendants' counsel, Ms. Park, Ms. Fitzgerald, and Mr. Dailey participated in a conference call with World Savings to request expedited processing of the World Savings payoff figures.[11]

E.    Dailey Fails to Close By 6:00 p.m. On Thursday, April 27, 2006.

According to Mr. Dailey's own admissions, Ms. Fitzgerald did not send a corrected HUD-1 Settlement Statement to Defendants' counsel until around 6:15 p.m. on Thursday, April 27, 2006. Motion at 9. Fitzgerald Declaration at 3, ¶ 13 (last sentence). By April 27, 2006 at

---

[11]    During this call, neither Ms. Fitzgerald nor Mr. Dailey advised World Savings that two loan payoff figures were needed.

13

6:00 p.m., Mr. Dailey had still: (a) failed to send to Ms. Park all of the documents that she

needed to sign at closing (which were due seven days prior); and (b) failed to complete closing.

Pursuant to the clear an unambiguous terms of the Settlement Agreement, if Mr. Dailey failed

"for any reason" to complete closing by 6:00 p.m. on Thursday, April 27, 2006, then:

> (a) Mr. Dailey will forever forfeit any right that he had to purchase
> the Property from Ms. Park under the Contract, under this
> Agreement, or otherwise (that is, the right of Mr. Dailey to
> repurchase the Property will automatically terminate without any
> further action by any Party), and his claims in the Litigation will be
> dismissed with prejudice; and (b) Defendants will be entitled to the
> immediate entry of a non-redeemable judgment for possession
> against Mr. Dailey, which they may execute immediately without
> any right of appeal or redemption.

Exhibit C at 2, Section 2.

## II.  LEGAL  ARGUMENT

A.    Mr. Dailey, not Defendants, Breached the Settlement Agreement on Multiple Occasions.

Although Mr. Dailey goes to great pains to try and convince the court that the

Defendants' breached the Settlement Agreement by failing to obtain payoff information from

World Savings, it was Mr. Dailey's responsibility, not the Defendants' to "take any and all steps

necessary in order to assure that  Mr. Dailey's purchase of the Property from Ms. Park and

disbursement of the Purchase Price to Ms. Park occurs on or before the Outside Closing Date."

Mr. Dailey did not comply with that provision, as he waited until the middle of April to start

preparing for closing.  It is also not known why neither Mr. Dailey nor Ms. Fitzgerald waited

until Friday, April 21, 2006 to request payoff information from World Savings.  The comedy of

errors committed by Mr. Dailey is astounding given that he knew on March 13, 2006 that he had

to go to closing by April 27, 2006, yet he waited nearly a full month to start preparing for

closing.  The errors committed by Ms. Fitzgerald are even more perplexing given her "ten years

14

of mortgage experience." It was Mr. Dailey's choice to leave his closing, and his fate under the Settlement Agreement, in the hands of a discount mortgage company (called "I-Want-a-Low-Rate.com"). Neither Mr. Dailey nor his mortgage broker took the necessary steps to find out from World Savings what needed to be done and in what time frame, and there was a complete breakdown of communications between Mr. Dailey, Ms. Fitzgerald, and the title company as to what was documents were actually required at closing and what Mr. Dailey really needed to do to prepare for closing in a timely fashion.

B.    The Legal Standards and Contractual Principles To Be Applied.

"A settlement agreement is a contract and, as such, it must fulfill the elements of a contract." Kilpatrick v. Paige, 193 F. Supp. 2d 145, 152 (D.D.C. 2002); Makins v. District of Columbia, 277 F.3d 544, 547 (D.C. Cir. 2002) (state contract law generally governs the enforcement of settlement agreements); Samra v. Shaheen Bus. & Inv. Group, Inc., 355 F. Supp. 2d 483, 491 (D.D.C. 2005) ("Whether parties have reached a valid settlement is a question of contract law.") (internal citations omitted). There is no question that the Settlement Agreement is a binding contract as Mr. Dailey himself seeks to claim a breach of that contract and to enforce its terms.

It is a generally accepted principle that every party to a contract represents that it intends to perform all of its obligations. Chedick v. Nash, 151 F.3d 1077 (C.A.D.C. 1998). A Court is to give plain meaning to the words that the parties employ in creating their contract. Segar v. Ashcroft, 2006 U.S. Dist. LEXIS 9207, *94-95 (citing Bragdon v. Twenty-Five Twelve Assocs., L.P., 856 A.2d 1165, 1170 (D.C. 2004) (citing DSP Venture Group, Inc., 830 A.2d at 852 (internal citations omitted)). The Court must also "honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract." Washington Metro. Area Transit

Auth. V. Nello L. Teer Co., 618 A.2d 128, 132 (D.C. 1992).  "A breach of contract is the failure, by one party, without legal excuse, to perform any promise which forms the whole or part of a contract."  Black's Law Dictionary, 188 (6th ed.).  A condition precedent is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."  Nortel Networks, Inc. v. Gold & Appel Transfer, S.A., 298 F. Supp. 2d 81, (D.D.C. 2004) (citing Restatement (2d) of Contracts § 224 (1981)); see also, Washington Props. v. Chin, Inc., 760 A.2d 546 (D.C. 2000) (A condition precedent may be defined as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."); Brier v. Orenberg, 90 A.2d 832, 833 (D.C. 1952) (A condition precedent is "a fact which must exist or occur before a duty of immediate performance of a promise could arise"); Chirichella v. Erwin, 270 Md. 178, 310 A.2d 555, 557 (Md. 1973) (Defining condition precedent as "a fact, other than mere lapse of time, which unless excused, must exist or occur before a duty of immediate performance of a promise arises").  Mr. Dailey has conceded, both in his Motion and in his correspondence to Defendant's counsel, that he did not send to Ms. Park (by FedEx) all of the documents that she needed to sign at closing at least seven days in advance of the closing date.  See Exhibit S (outlining in detail Mr. Dailey's failure to comply with the seven day advanced notice requirement of the Settlement Agreement). It is clear that Ms. Park was under no duty to perform because the condition precedent to her performance had not been fulfilled by Mr. Dailey.  As this condition precedent was never met, Ms. Park, by operation of law, is excused from any duty of performance that she had.

No particular form of words is necessary in order to create an express condition.  The determination of whether a provision in a contract constitutes a condition precedent is a question of "construction dependent on the intent of the parties to be gathered from the words they have

employed and, in case of ambiguity, after resort to the other permissible aids to interpretation."
Miller v. Bristol-Myers Squibb Co., 121 F. Supp. 2d 831, 840 (S.D. Md. 2000) (quoting New
York Bronze Powder Co., Inc. v. Benjamin Acquisition Corp., 351 Md. 8, 14, 716 A.2d 230, 233
(1998) (internal citation omitted).  The question whether a provision in a contract "constitutes a
condition precedent is one of construction dependent on the intent of the parties to be gathered
from the words they have employed and, in case of ambiguity, after resort to other permissible
aids to interpretation."  Canaras v. Lift Truck Servs., Inc., 322 A.2d 866, 875 (Md. 1974)
(quoting Chirichella, 310 A.2d at 557).   It is clear from the language of the Settlement
Agreement that the parties intended that Mr. Dailey must provide the required documentation,
i.e., a conforming sales contract, a completed HUD-1, a Borrower's Affidavit, an Addendum to
HUD-1, a completed DC Form FP-7 (i.e., "any other documents that Defendants are required to
sign for the closing"), before Ms. Park was obligated to perform pursuant to the Settlement
Agreement.

    Interpretation of the Settlement Agreement is a question of law for the court.  See 1010
Potomac Assocs. v. Grocery Mfrs. of Am., Inc., 485 A.2d 199, 205 (D.C. 1984). As discussed,
supra, the Court must "honor the intentions of the parties as reflected in the settled usage of the
terms they accepted in the contract."  Washington Metro. Area Transit Auth. v. Nello L. Teer.
Co., 618 A.2d 128, 132 (D.C. 1992).  The intention of the parties at the time the Settlement
Agreement was executed was for Mr. Dailey to provide "the Sales Contract and any other
documents that Defendants are required to sign for the closing" at least seven days prior to the
closing date.  This language is clear and unambiguous.  Mr. Dailey failed to comply with this
provision within the time prescribed by the Settlement Agreement and therefore cannot now
argue to the Court that the "real" intent was for him to provide these documents to Ms. Park

whenever he wanted to and in a piecemeal fashion. Mr. Dailey is now attempting to rewrite the terms of the Settlement Agreement to impose additional obligations on the Defendants and to provide himself with an extension of his time to perform. The Court cannot rewrite the terms of the Settlement Agreement to suit Dailey's requests.

Mr. Dailey's breaches of the Settlement Agreement are multiple, they are material as they go to the essence of the parties' bargain, and they are not curable. Mr. Dailey also breached the confidentiality provision of the Settlement Agreement by providing a copy of the Settlement Agreement to his mortgage broker. See Exhibit T (April 11, 2006 e-mail from Mr. Dailey stating that my mortgage broker has the only copy of the Settlement Agreement."); see also Exhibit C, at 6, Section 19 (agreement to keep Settlement Agreement confidential and prohibiting Mr. Dailey from disclosing its terms to others).

C.    The Defendants Have Not Waived Compliance By Dailey.

Mr. Dailey also argues that the Defendants have waived compliance with the Settlement Agreement. Mr. Dailey is wrong again. In each and every correspondence with Mr. Dailey, and the conference call with the Court on April 27, 2006, Defendant's counsel informed Mr. Dailey that if he did not close on time, the Defendants were not waiving their rights under the Settlement Agreement. See e.g., Exhibit K at 2 (second to last paragraph); see also Landow v. Georgetown-Inland West Corp., 454 A.2d 310 (D.C. 1982) ("where time is not of the essence in a written contract, strict compliance with date of performance may be waived by oral agreement. (Citing Sweeney v. Jacobsen, 103 F. Supp. 393 (D.D.C. 1952), aff'd, 92 U.S. App. D.C. 93, 202 F.2d 461 (1953)"). "However, where time is contractually stipulated to be of the essence, this rule does not apply. Modification of the time of settlement is a material change of the original

contract which cannot be accomplished without a writing.")).  The Defendants never agreed, in

writing or otherwise, to give Mr. Dailey an extension of the closing date.

D.      Mr. Dailey's Request for Attorney's Fees is Without Merit.

        In his Motion, Mr. Dailey seeks and award of attorney's fees.   Mr. Dailey is representing

himself and has not incurred any attorney's fees.  It is not known how Mr. Dailey can make such

a request in good faith and consistent with Rule 11.  In any event, Mr. Dailey is not a prevailing

party within the meaning of Section 25 of the Settlement Agreement and he cannot recover

attorney's fees that he has not incurred.

E.      Mr. Dailey's Alternative Request to Declare the Settlement "Void" and Proceed With
        Litigation is Baseless.

        Mr. Dailey offers no legal or factual support for his claim that the Settlement Agreement

should be declared void.  The Settlement Agreement is a contract, supported by consideration,

that is enforceable.  See Autera v. Robinson, 419 F.2d 1197, 1200 (D.C. Cir. 1969) ("It is now

well established that the trial court has power to summarily enforce on motion a settlement

agreement entered into by the litigants while the litigation is pending before it.") (internal

citations omitted).  Again, Mr. Dailey, an officer of the Court, has submitted a request to the

Court that has no legal or factual basis.  Autera, 419 F.2d at 1201 ("a valid settlement agreement,

once reached, cannot be repudiated by the parties.").  This is yet again another improper request

by Mr. Dailey and a veiled threat to increase the Defendants' costs.

CONCLUSION

        Mr. Dailey has demonstrated throughout the course of his dealings with this Court and

with Defendants, even though he is an officer of the Court, that he believes that court orders,

ethical rules, and written agreements are optional to him and do not apply.  In the Settlement

Agreement, Defendants gave Mr. Dailey a second (and final) bite at the repurchase apple, but Mr. Dailey again failed to perform his end of the bargain. The consequences for Mr. Dailey's failure to perform are clearly spelled out in the Settlement Agreement, and this Court must now enforce its terms. Mr. Dailey's cry for "pursuit of a just result" is an attempt to ask the Court to rewrite the terms of the Settlement Agreement, which this Court simply does not have the authority to do. Mr. Dailey's breaches are clear, are numerous, are substantial, and go to the essence of the parties' bargain. The Defendants are entitled to receive the remedy that they bargained for in the Settlement Agreement. There is nothing "unjust" in that result as that very result was bargained for by Mr. Dailey. Mr. Dailey must now live with the consequences of his failure to abide by the terms of the Settlement Agreement.

WHEREFORE, for these reasons, and for any reasons that may be advanced at a hearing on this matter, the Defendants request that the Court:

(a)    determine that Mr. Dailey has failed to strictly comply with the terms of the Settlement Agreement and that Mr. Dailey has breached the Settlement Agreement;

(b)    enforce Section 2 of the Settlement Agreement, which states that Mr. Dailey has forever forfeited any right that he had to purchase the Property from Ms. Park under the Contract, under the Settlement Agreement, or otherwise

(c)    enter an Order dismissing all claims in the Litigation with prejudice, except as to Ms. Park's claim for possession; and

(d)    enter a non-redeemable judgment for possession against Mr. Dailey, which judgment Defendants may execute immediately upon without any right of appeal or redemption by Mr. Dailey; and

(e)    enter and order releasing the funds being held in the Court Registry to Defendants; and

(f)     enter an award of attorney's fees and costs.[12]

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

_____
James D. Sadowski, No. 446635
1620 L Street, N.W. - Suite 900
Washington, D.C.  20036-5605
(202) 452-1400
*Counsel for Defendants*

---

[12]    If the Court determines that Mr. Dailey has breached the Settlement Agreement and Defendants are the prevailing party on this issue, Defendants' counsel will submit an appropriate application for attorney's fees and costs as ordered by the Court.

21

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing Defendants' Opposition To Plaintiff's Motion To Enforce Closing Of Property Under Settlement Agreement, Or In The Alternative, To Declare Settlement Agreement Void And Proceed With Litigation was filed electronically with the Court this 4th day of May, 2006 (hard copy to Chambers), and sent by first class mail and electronic mail (as indicated) to the following person(s)

> Jonathan C. Mr. Dailey
> 3 Bethesda Metro Center
> Suite 530
> Bethesda, MD 20814
> *Pro Se Plaintiff*
> *Jonathan@ClearCreekPartners.com*
>
> Jonathan C. Mr. Dailey
> 1610 Little Raven Street
> Unit 410
> Denver, CO 80212
> *Pro Se Plaintiff*

James D. Sadowski

287417v1

22